2010 Ark. App. 841

NATIONAL BANK OF ARKANSAS, Appellant

v.

RIVER CROSSING PARTNERS, LLC, and Robert Aguiar, Individually and as Trustee of the Robert J. Aguiar Revocable Trust, Appellees.

No. CA 10–222.

Court of Appeals of Arkansas.

Dec. 15, 2010.

Rehearing Denied Jan. 19, 2011.

---

Stephen L. Gershner and Charles Darwin "Skip" Davidson, Davidson Law Firm Ltd., Little Rock, for appellant.

James Gerard Schulze, Baker & Schulze, Cade Lee Cox and David W. Sterling, Cox & Sterling, PLLC, Little Rock, for appellee.

JOHN MAUZY PITTMAN, Judge.

National Bank of Arkansas brings this appeal from a judgment entered on a jury verdict by the Pulaski County Circuit Court. Appellant filed this action for judgment on five promissory notes, foreclosure on mortgages of real property, and enforcement of a security agreement covering an investment account owned by appellee Robert Aguiar. Robert Aguiar brings a cross-appeal. We reverse and remand on the direct appeal and affirm on the cross-appeal.

The appellees involved in this appeal are River Crossing Partners, LLC (RCP), and Robert Aguiar, individually and as Trustee of the Robert J. Aguiar Revocable Trust. On May 2, 2005, Robert Aguiar, his son, Clinton Aguiar, and Gary Washam (the RCP parties) borrowed money from appellant to purchase and develop a subdivision in Maumelle. Each of the RCP parties signed the note, which was secured by a mortgage of the subdivision property, real property in Little Rock and Hot Springs Village owned by Robert Aguiar, a security agreement pledging an investment account owned by Robert Aguiar, and an assignment of the investment account from Robert Aguiar. The security agreement stated that it secured all present and future debts of RCP, Robert Aguiar, Clinton Aguiar, and Gary Washam and granted a lien on Robert Aguiar's investment account, which contained three $100,000 bonds at that time. Similarly, the assignment of the securities account granted appellant a lien on Robert Aguiar's investment account to secure the present and

future debts of RCP, Robert Aguiar, Clinton Aguiar, and Gary Washam. The RCP parties renewed this loan in the amount of $1,354,323 on October 30, 2007 (Note 1). Robert Aguiar borrowed $88,000 from appellant to pay the interest on that loan at the same time (Note 2).

Appellant later made a construction loan to HomeBuilderOne, Inc. (HOI) and Clinton Aguiar (Note 3), which was secured by a mortgage on the subdivision property. Appellant also made two construction loans to Washam Construction Company (WCC) and Gary Washam (Notes 4 and 5). Appellant took the position below, and argues on appeal, that the HOI and WCC construction loans were also secured by Robert Aguiar's investment account. Appellees disputed this.

No lots were sold after January 2007. All of the loans went into default by June 2008. After Robert Aguiar created the Robert J. Aguiar Revocable Trust on August 15, 2008, he transferred a significant amount of property to it; according to appellant, some of that property secured the notes to appellant. Appellant completed construction of the houses; purchased some improvement district bonds; and made payments on the improvement district tax assessments. On September 4, 2008, appellant filed this action seeking judgment on the notes, foreclosure of its mortgages, and enforcement of the security agreement. In its third amended complaint, appellant added a claim of fraudulent conveyance against Robert Aguiar and the trust, alleging that Robert Aguiar had fraudulently transferred a house in Little Rock (the Brodie Creek house) and a house in Hot Springs Village (the Buque House) to the trust. Appellant asked the court to void those transfers as fraudulent and asked for a lien to be imposed on those properties.

Appellees did not dispute that appellant was entitled to foreclose on the mortgaged real property, but they asserted that appellant was not entitled to enforce the security agreement against all, but only one, of the bonds in Robert Aguiar's securities account. Robert Aguiar also denied transferring his property to the trust to avoid his creditors and asserted that his intent had been to avoid probate. Appellees disputed the amount of money that they owed appellant at the time of default. RCP and Robert Aguiar filed counterclaims against appellant for breach of contract, rescission, modification or reformation of the notes, and for claims arising out of appellant's collection practices. Gary Washam and Clinton Aguiar filed for bankruptcy before trial.

Over appellant's objection, the trial court granted RCP's and Robert Aguiar's request for a jury trial. At a pretrial hearing, the trial court stated that it could submit the amount of the debt to the jury and reserve for itself the equitable issues. Appellant filed a motion objecting to that procedure, which the trial court denied.

Appellant's Special Assets Officer, Jackson Balentine, testified at trial about the amounts due on the loans. Clinton Aguiar testified that, although he had repeatedly asked appellant to explain the construction line advances charged to the RCP debt when there was no construction being done, appellant did not satisfactorily explain them to him. Neal Ferguson, with Investment Professionals, Inc., testified about Robert Aguiar's investment account. Robert Aguiar; Mike Fisher, appellant's Senior Vice President of Commercial Lending; John Gregson, who was a vice president with appellant and the loan officer who originated these loans; and Gary Washam testified.

The court directed a verdict against several of appellees' claims. It denied appellant's motion for directed verdict on the amount of the debt owed by appellees. It

granted a directed verdict on appellant's right to foreclose on the mortgaged real estate. The jury rendered the following verdicts:

a. On Loan No. 1 (promissory note from RCP, Aguiar, Clinton Aguiar, and Gary Washam to NBA dated 5/2/05 and renewed on 10/30/07, NBA loan no. 4112553) the jury unanimously found that RCP and Aguiar breached their contract and assessed damages in favor of NBA against RCP and Aguiar in the total amount of $500,000;

b. On Loan No. 2 (promissory note from Aguiar to NBA dated 10/30/07, NBA loan No. 4119717) the jury unanimously found that Aguiar breached the contract and assessed damages in favor of NBA against Aguiar in the amount of $95,233.78;

c. The jury unanimously found that under the security agreements, NBA deposit account #571881 is collateral for Loan No. 1 and Loan No. 2;

d. The jury unanimously found that under the security agreements, NBA deposit account #572446 is collateral for Loan No. 1 and Loan No. 2;

e. The jury found, by vote of 11 jurors, that under the security agreements, Bond CUSIP #345370BX7 (Ford Motor Co. Del Def) is collateral for Loan No. 1 and Loan No. 2, but is not collateral for Loan No. 3 (promissory note from HOI to NBA, dated 1/5/07, NBA loan No. 4117461), Loan No. 4 (promissory note from WCC to NBA dated 3/7/06, NBA Loan No. 4115085), or Loan No. 5 (promissory note from WCC to NBA dated 1/11/07, NBA loan No. 4117893);

f. The jury found, by vote of 11 jurors, that under the security agreements, Bond CUSIP #345402Z87 (Ford Motor Credit Medium Term NTS) is collateral for Loan No. 1 and Loan No. 2, but is not collateral for Loan No. 3, Loan No. 4, or Loan No. 5;

g. The jury unanimously found that under the security agreements, Bond CUSIP #3133FOD89 (Federal Home LN. Mtg. Corp Medium Term NTS) is collateral for Loan No. 1 and Loan No. 2, but is not collateral for Loan No. 3, Loan No. 4, or Loan No. 5;

h. The jury unanimously found that Lot 3R, Brodie Creek Community, an addition to the City of Little Rock was fraudulently transferred from Aguiar to the Trust;

i. The jury unanimously found that Lot 4, Block 4 Buque Subdivision, Hot Springs Village was not fraudulently transferred from Aguiar to the Trust;

j. The jury unanimously found that NBA did not breach its contract referred to as Loan No. 1 with RCP and Aguiar;

k. The jury unanimously found that NBA did not breach its contract referred to as Loan No. 2 with Aguiar;

l. The jury unanimously found that NBA did not convert property of Aguiar; and

m. The jury unanimously found that NBA made an unlawful claim against title of property belonging to Aguiar and awarded damages of $0.00.

The circuit court then entered judgment on the verdict and granted foreclosure against the property securing the debts. It declared the deed of the Brodie Creek property to the trust to be void and dismissed appellant's claim to avoid the transfer of the Buque House. The court noted that Gary Washam had been discharged in bankruptcy and dismissed all claims against him. Appellant moved for judgment notwithstanding the verdict, vacation of the order granting a jury trial, treat-

ment of the jury verdict as advisory, new trial, and mistrial. The trial court denied this motion. Appellant appealed from the judgment and the order denying its post-trial motion. Appellees filed a cross-appeal.

Appellant's arguments on appeal are: (1) the trial court erred in submitting its foreclosure and fraudulent-transfer claims to the jury; (2) the trial court erred in refusing to grant its motions for directed verdict, JNOV, new trial, and mistrial; (3) the jury's verdict that Notes 3, 4, and 5 were not secured by the bonds in Robert Aguiar's investment account was not supported by substantial evidence; (4) the jury's verdict that Robert Aguiar's transfer of the Buque House was not a fraudulent transfer was not supported by substantial evidence.

Appellant argues that the trial court erred in submitting the following issues to the jury: (1) the amount due from RCP and Robert Aguiar on Note 1; (2) whether Notes 3, 4, and 5 were secured by Robert Aguiar's bonds; and (3) whether Robert Aguiar's transfer of the Buque House to the trust was avoidable as a fraudulent transfer. In its argument on all three issues, it urges us to hold that the adoption of Amendment 80 to the Arkansas Constitution, which abolished chancery courts and vested jurisdiction for actions at law and in equity in the circuit courts, did not expand a party's right to a jury trial. It asks us to recognize that the cleanup doctrine, which allowed the chancery court to decide legal issues that were incidental to or related to the determination of equitable issues, *see Colclasure v. Kansas City Life Insurance Co.*, 290 Ark. 585, 720 S.W.2d 916 (1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987), is still viable after the adoption of Amendment 80. It contends that, because it sought foreclosure, a strictly equitable remedy, against the property securing the

notes on which it sought judgment, and an equitable lien on the Buque House, the incidental issues of the amounts due on the notes, whether other notes were secured by the bonds, and whether the transfer of the Buque House was avoidable as a fraudulent transfer, were not triable to the jury. Appellant relies on the Arkansas Supreme Court's recent decisions in *Ludwig v. Bella Casa*, 2010 Ark. 435, 372 S.W.3d 792, and *First National Bank of DeWitt v. Cruthis*, 360 Ark. 528, 203 S.W.3d 88 (2005).

Appellees respond that appellant's underlying cause of action was for breach of contract, which was at law, and that, although appellees conceded that they owed some money to appellant, they disputed how much they owed. They urge us to hold that it was appropriate for the trial court to send the damages element of their claim to the jury and retain for itself the remaining equitable issues. We disagree.

■ In *Cruthis*, the appellant had sought restitution and an equitable lien in Count I of the complaint; the appellees had requested a jury trial in their counterclaim. The circuit court submitted the case to the jury, and the appellant argued on appeal that submission of the restitution claim to the jury was error. The supreme court held that a plaintiff's claim for an equitable lien should not have been submitted to a jury because that cause of action could not be heard in circuit court before Amendment 80. The supreme court held that no new or expanded jurisdiction beyond that formerly existing in the chancery and circuit courts was created through Amendment 80; rather, circuit court jurisdiction now includes all matters previously cognizable by circuit, chancery, probate, and juvenile courts. The court cautioned that Amendment 80 did not alter the jurisdiction of law and equity; matters that could be submitted to a jury for decision and the matters that

must be decided by the court remain unaltered. It concluded:

> Thus, although unjust enrichment is an equitable cause of action, because it is based on the alleged breach of an implied contract, it may be heard in circuit court and may be heard by a jury. *See, e.g., Fite [v. Fite,* 233 Ark. 469, 345 S.W.2d 362 (1961)], *supra.* However, we must reverse because restitution was not the only equitable remedy sought in Count I. FNB also sought an equitable lien on certain property. An equitable lien is a right to have a demand satisfied from a particular fund of specific property. *Kane Enter. v. MacGregor, Inc.,* 322 F.3d 371 (5th Cir. 2003) (quoting *Blacks Law Dictionary* 934 7th ed. (1999)). An equitable lien has also been defined as a remedy that awards a nonpossessory interest in property to a party who has been prevented by fraud, accident or mistake from securing that to which he was equitably entitled. *Lorimer v. Berrelez,* 331 F.Supp.2d 585 (E.D.Mich.2004) (quoting *Senters v. Ottawa Sav. Bank,* 443 Mich. 45, 503 N.W.2d 639 (1993)). An action on an equitable lien was historically heard in chancery court because it is an equitable remedy. *See Dews v. Halliburton Indus. Inc.,* 288 Ark. 532, 708 S.W.3d [S.W.2d] 67 (1986); *Rose City Bottling Works v. Godchaux Sugars, Inc.,* 151 Ark. 269, 236 S.W. 825 (1922). Because an equitable lien was sought, the circuit court erred in submitting Count I to the jury, and because we reverse on this basis, we need not address the remaining issues.

360 Ark. at 537, 203 S.W.3d at 94.

On November 11, 2010, the supreme court relied on *Cruthis* in deciding *Ludwig v. Bella Casa.* It reversed and remanded that part of the trial court's decision that sent a nuisance claim to the jury and reserved for itself the question of whether to grant an injunction:

> We have a similar situation in the present case. The circuit judge submitted the issue of whether appellant's airstrip was a nuisance to the jury, but reserved the issue of remedy for the court. Traditionally, the determination of whether something constitutes a private nuisance and whether to grant equitable relief was for a chancellor to decide in a court of equity. Relying on our holding in *Cruthis,* we reverse the circuit court's decision to submit the private nuisance claim to a jury. As a claim that would normally lie in equity, the circuit court erred in submitting the nuisance issue to the jury.

2010 Ark. 435, at 8–9, 372 S.W.3d at 797–98.

In his dissent from that part of the majority opinion in *Ludwig,* Justice Brown cited the following passage from a treatise authored by former Justice David Newbern and Professor John J. Watkins, *Civil Practice & Procedure* § 29:3, at 564 (4th ed.2006):

> With the merger of law and equity and elimination of the separate chancery courts, there is simply no justification for retaining any remnant of the cleanup doctrine and a system under which the fundamental right to a jury trial turned on the choice of words in a pleading.
>
> When a case with legal and equitable claims involves common questions of fact, the preferable approach is to try those questions to the jury, perhaps on written interrogatories as allowed by Ark. R. Civ. P. 49(a), before the court determines whether equitable relief is appropriate. The jury's findings would be binding on the court, which would serve as fact-finder only as to noncommon factual questions arising in connection with the equitable relief. If the

order of trial is arranged in this fashion, the right to jury trial on the legal claims would be ensured. Temporary equitable relief, if appropriate, could be granted pending a final adjudication on the merits.

In *Ludwig*, therefore, the supreme court rejected the approach of the treatise quoted above and essentially upheld the viability of the cleanup doctrine after the adoption of Amendment 80. In light of the supreme court's interpretation of *Cruthis* in *Ludwig*, we must reverse and remand on this point and, consequently, on the entire direct appeal.

On cross-appeal, Robert Aguiar argues that the trial court erred in directing a verdict for appellant on his claim for abuse of process at the close of the evidence. He contends that he produced substantial evidence that appellant intentionally perverted the legal process to accomplish an ulterior purpose for which it was not designed; that appellant overreached, by filing lis pendens on property that was not pledged as collateral, on the pretext that he had fraudulently transferred it into the trust; and that appellant hamstrung his ability to manage his financial affairs and to defend himself in this lawsuit. He points to his testimony that Jackson Balentine told him, "We're going to get everything you own," even though appellant was entitled to less than that.

One asserting an abuse-of-process claim must establish that (1) a legal procedure was set in motion in proper form, even with probable cause and ultimate success; (2) the procedure was perverted to accomplish an ulterior purpose for which it was not designed; and (3) a willful act was perpetrated in the use of process which was not proper in the regular conduct of the proceeding. *South Ark. Petroleum Co. v. Schiesser*, 343 Ark. 492, 36 S.W.3d 317 (2001). The test of abuse of process is whether a judicial process was used to extort or coerce. *Id.* The key to the tort is the improper use of process after its issuance in order to accomplish a purpose for which the process was not designed. *Id.* Thus, it is the purpose for which the process was used, once issued, that is important in reaching a conclusion. *Id.*

Because Robert Aguiar failed to establish an ulterior purpose or an improper act on the part of appellant, we affirm on the cross-appeal.

Reversed and remanded on direct appeal; affirmed on cross-appeal.

GLADWIN and ABRAMSON, JJ., agree.