Cite as 2020 Ark. 208

# SUPREME COURT OF ARKANSAS

No. CV-18-313

| | |
|---|---|
| | Opinion Delivered: May 28, 2020 |
| DOLLAR GENERAL CORPORATION; DOLGENCORP, LLC, D/B/A DOLLAR GENERAL; CADDO TRADING CO., INC.; AND RODNEY FAGAN AND JUDY FAGAN | APPEAL FROM THE MONTGOMERY COUNTY CIRCUIT COURT [NO. CV-13-30] |
| APPELLANTS | HONORABLE JERRY RYAN, JUDGE |
| V. | |
| KAREN ELDER | AFFIRMED; COURT OF APPEALS' OPINION VACATED. |
| APPELLEE | |

COURTNEY RAE HUDSON, Associate Justice

Appellants Dollar General Corporation and Dolgencorp, LLC, d/b/a Dollar General (collectively "Dollar General"), Caddo Trading Co., Inc., and Rodney Fagan and Judy Fagan (collectively "the Landlords"), appeal the Montgomery County Circuit Court's August 8, 2017 judgment on jury verdict in favor of appellee Karen Elder ("Elder").[1] For reversal, appellants argue (1) the circuit court erred by not granting their motion for a directed verdict because Elder failed to prove that the sidewalk she slipped on was unreasonably dangerous; (2) the circuit court erred by not granting their motion for a

---

[1]Dollar General Corporation and Dolgencorp, LLC, are corporate entities that operate the Dollar General store where the events giving rise to this appeal occurred. Caddo Trading Co., Inc., and Rodney Fagan and Judy Fagan represent the owners of the property on which the Dollar General store is located.

directed verdict because Elder did not prove that the Landlords failed to maintain the sidewalk outside the store or failed to keep the premises in compliance with the Americans with Disabilities Act (ADA); (3) the circuit court abused its discretion as a matter of law by allowing a chiropractor to testify as an expert regarding the causal connection between Elder's fall and the treatment provided by other physicians; and (4) the circuit court abused its discretion by allowing Elder to give causation testimony regarding her treatments that were not rendered in temporal proximity to the occurrence of the accident. We affirm.

This case began at approximately 4:00 p.m. on June 10, 2010, when Elder, a registered nurse, went to purchase milk at the Dollar General store in Mt. Ida, Arkansas. It was raining that day, and the concrete outside was wet when Elder slipped and fell near the store's entrance. Fearing that others might slip in the same area, Elder reported her fall to Pam Bryant, who was the assistant manager of the store. Bryant completed a report. At that time, Elder had worked as a nurse with the Mt. Ida School District for approximately nine years.

Elder sought medical treatment the day after her fall, and she subsequently received treatment from a chiropractor, a neurologist, a neurosurgeon, and an orthopedic surgeon. Elder eventually underwent neck, back, and shoulder surgery. According to Elder, she has continuing pain in her neck and back. However, Elder did experience neck and back pain prior to the accident, and she had seen her chiropractor, Eric Carson, D.C., for treatment since 2004.

2

Elder filed a complaint against appellants on June 7, 2013, and an amended complaint on August 15, 2014. In the amended complaint, Elder alleged that she was injured when she slipped on the wet concrete at the entrance to the Dollar General store. Elder further alleged that she was a business invitee and that appellants had a duty to use reasonable care in maintaining their business premises; that appellants knew or should have known that the rain was causing the concrete at the outside entrance to become dangerously and unexpectedly slippery; and that if the appellants had used reasonable care to either post appropriate signs warning of the slippery concrete and/or ensure that mats were in place outside the entrance, her injury would not have occurred. Elder claimed that she was permanently disabled because of the fall and that she had sustained and will continue to sustain pain, medical expenses, permanent impairment, scars and disfigurement, and loss of earnings. Appellants answered and denied liability.

Less than three weeks before the trial, Elder supplemented her discovery responses to notify appellants that Carson planned to testify as to the cause of Elder's injuries, the reasonableness and necessity of her medical bills, and the permanency of her injuries. Thereafter, appellants filed a motion in limine in which they sought to exclude any causation testimony from either Elder or Carson. As to Carson, Dollar General and the Landlords argued that he was not qualified to provide causation testimony and that his proposed testimony conflicted with his prior deposition testimony. The circuit court denied the motion.

The jury trial was held from July 24 to July 27, 2017. At issue was whether appellants failed to maintain the premises in a reasonably safe condition and whether Elder's slip and fall caused the need for her medical treatment. Elder testified that she approached the entry from the right side and that it was misting rain that day. According to Elder, she was either jogging or slowly running to the entrance to escape the rain when the next thing she knew, she was lying on the ground. Elder believed that she had been briefly knocked unconscious. Elder recalled that the area where she fell was slick and that no mat was present. To establish that the concrete was unreasonably dangerous, Elder presented testimony from Bryant, the former assistant manager of Dollar General, who said that the area was slick and that she had seen at least four other people slip there, although not all of them fell all the way to the ground. Bryant testified that even she herself had slipped there. Bryant also testified that she had personally alerted three Dollar General district managers about the issue, along with Rodney Fagan, a landlord. Bryant recounted that Fagan advised her that it would be "taken care of." Elder recalled that Bryant expressed concern that someone would be injured in that area. Elder also presented expert testimony from Jennings. Jennings testified that he tested the concrete at the entrance and determined it to be unsafe and probable that an accident would occur. Both Bryant and Jennings testified that one part of the exterior concrete had a rough finish and that another part had a smoother finish.

In order to prove that the fall caused her injuries, Elder offered her own testimony and that of Carson. Elder testified over appellants' objection that her medical expenses

4

were reasonable and medically necessary. When Elder called Carson, appellants renewed their objection and argued that Carson was not a medical doctor and was not qualified to give expert testimony that the treatment the medical doctors provided was causally related to Elder's fall. Outside the presence of the jury, the circuit court conducted extensive voir dire to determine Carson's qualifications. After voir dire and arguments from counsel, the circuit court ruled that Carson could give expert testimony that Elder's injuries and need for medical care, including her surgeries, were caused by her fall. Thereafter, appellants moved for a continuance, but the circuit court denied the motion. Carson then testified before the jury that it was more probable than not that Elder's symptoms, injuries, and need for medical treatment were caused by her fall at Dollar General.

At the close of Elder's case, appellants moved for a directed verdict and argued that Elder did not introduce substantial evidence that the concrete was unreasonably dangerous or improperly maintained. The circuit court denied the motion. Appellants then presented their case. They offered testimony from orthopedic surgeon Owen Kelly, M.D., and neurologist Alonzo Burba, M.D. Kelly testified that he believed Elder's treatment needs were caused by degenerative conditions. Burba offered no opinion as to the cause of Elder's medical issues. Appellants also moved for directed verdict at the conclusion of all testimony. The circuit court denied that motion as well.

The case was submitted to the jury on interrogatories and it returned a $700,000 verdict. The jury also apportioned liability among the parties and assigned 22.5 percent of the fault to each Dollar General, Dolgencorp, Caddo Trading Co. Inc, and the Fagans.

5

The jury found Elder to be 10 percent at fault. The $700,000 damages award was reduced to a judgment totaling $630,000 split equally between the four defendants. The circuit court entered judgment on the jury verdict on August 8, 2017. Appellants filed a motion for judgment notwithstanding the verdict or for a new trial that was deemed denied, and they filed a timely appeal of the judgment. Our court of appeals affirmed, and this court granted appellants' petition for review. We consider the appeal as though it was originally filed in this court. *Martin v. Smith*, 2019 Ark. 232, 576 S.W.3d 32.

On appeal, appellants argue that (1) the circuit court erred by not granting their motion for a directed verdict because Elder failed to prove that the sidewalk she slipped on was unreasonably dangerous; (2) the circuit court erred by not granting their motion for a directed verdict because Elder did not prove that the Landlords failed to maintain the sidewalk outside the store or failed to keep the premises in compliance with the ADA; (3) the circuit court abused its discretion as a matter of law by allowing a chiropractor to testify as an expert regarding the causal connection between Elder's fall and the treatment provided by other physicians; and (4) the circuit court abused its discretion by allowing Elder to give causation testimony regarding her treatments that were not rendered in temporal proximity to the occurrence of the accident.

We first consider Elder's motion for a directed verdict. Our standard of review of the denial of a motion for directed verdict is whether the jury's verdict is supported by substantial evidence. *Crawford Cty. v. Jones*, 365 Ark. 585, 232 S.W.3d 433 (2006). Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to

6

compel a conclusion one way or the other. *Id.* In determining whether there is substantial evidence, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Nat'l Bank of Ark. v. River Crossing Partners, LLC*, 2011 Ark. 475, 385 S.W.3d 754. A motion for directed verdict should be denied when there is a conflict in the evidence, or when the evidence is such that fair-minded people might reach a different conclusion. *Id.*

Appellants first argue that they were entitled to a directed verdict because Elder failed to prove that the wet concrete presented an unreasonably dangerous condition. There is no dispute that Elder was an invitee. In Arkansas, a property owner has a duty to exercise ordinary care to maintain the premises in a reasonably safe condition for the benefit of invitees. *Dye v. Wal-Mart Stores, Inc.*, 300 Ark. 197, 777 S.W.2d 861 (1989). The basis of a defendant's liability under this rule is superior knowledge of an unreasonable risk of harm of which an invitee, in the exercise of ordinary care, does not know or should not know. *Jenkins v. Hestand's Grocery, Inc.*, 320 Ark. 485, 898 S.W.2d 30 (1995). An owner's duty to warn an invitee of a dangerous condition applies only to defects or conditions such as hidden dangers, traps, snares, pitfalls and the like, in that they are known to the owner but not to the invitee and would not be observed by the latter in the exercise of ordinary care. *Ethyl Corp. v. Johnson*, 345 Ark. 476, 49 S.W.3d 644 (2001). An Arkansas landowner generally does not owe a duty to an invitee if a danger is known or obvious. *Kuykendall v. Newgent*, 255 Ark. 945, 504 S.W.2d 344 (1974).

With these authorities in mind, we turn to the evidence adduced at trial, which demonstrated that the concrete's texture was not uniform. Jennings, Elder's safety expert, testified that the smoother area of the concrete created the potential for an accident. According to Jennings, a slip-resistant mat or a slip-resistant coating could have been used to reduce the risk. Additionally, Bryant testified that she and other people had slipped there. She further confirmed that a mat was not always in place outside the entrance. Bryant told Elder that usually a cart was placed in the area to prevent falls but that it had been brought inside because of the rain and that someone had forgotten put a mat in place. This testimony provides substantial evidence that the concrete presented an unreasonably dangerous condition.

Elder also introduced substantial evidence that appellants were aware of this condition. Bryant testified that she personally notified three Dollar General district managers and that she also told Rodney Fagan. As a result, we hold that substantial evidence exists that appellants were aware of the dangerous condition. This conclusion, however, does not end the inquiry. As stated previously, a landlord generally has no duty to warn an invitee of a known or obvious danger. Appellants argue that the danger was obvious because it is common knowledge that concrete may become slippery when it is wet and because Elder herself could have seen that the concrete was wet. Thus, appellants argue that the danger was not "hidden." In support of their argument, appellants cite Jennings's testimony that his evaluation of the concrete included a visual inspection and

argue that Elder should have noticed the danger just as Jennings did. Appellants contend that we should be guided by *Jenkins*, 320 Ark. 485, 898 S.W.2d 30.

This reliance is misplaced. In *Jenkins*, the plaintiff alleged that she slipped in the middle of an incline that had been built to aid carts and wheelchairs in negotiating the curb between the store and the parking lot. Evidence before the circuit court revealed that the condition had existed for twenty-nine years and that the store had served between 3,000 and 4,000 customers per year without incident. The circuit court granted summary judgment in favor of the grocery store. The court concluded that Jenkins had presented no evidence that the condition was dangerous or an unreasonable risk and that there was no evidence that the store owners were aware that the ramp constituted an unreasonable risk to its invitees. *Jenkins*, 320 Ark. 485, 898 S.W.2d 30. In contrast, here, Elder presented evidence that multiple people had slipped on the smooth concrete and that both Dollar General and the Landlords had been notified of the danger. Likewise, although Jennings performed a visual evaluation of the concrete as part of his investigation, an expert's trained eye that is looking with 20/20 hindsight for dangerous conditions cannot be equated to a customer who casually enters a store and may be less concerned with evaluating the surface characteristics of the concrete walkway than with avoiding a collision with other customers entering or leaving the store. Further, Rodney Fagan testified that he had seen the concrete and that it did not look slippery to him. Finally, Elder testified that she had entered the store multiple times before and had never noticed the differences in the concrete's texture. Viewing the evidence in the most favorable light to Elder, as we

9

must, *see River Crossing Partners*, 2011 Ark. 475, 385 S.W.3d 754, we conclude that substantial evidence supports the jury's verdict and affirm on this point.

The Landlords also raise an issue specific to them. According to the Landlords, the circuit court erred by not directing a verdict in their favor because Elder did not introduce any evidence that they failed to maintain the concrete outside the store or that they failed to keep the premises in compliance with the ADA. Arkansas Code Annotated section 18-16-110 (Repl. 2015) provides that

> [n]o landlord or agent or employee of a landlord shall be liable to a tenant or a tenant's licensee or invitee for death, personal injury, or property damage proximately caused by any defect or disrepair on the premises absent the landlord's:
>
> (1) Agreement supported by consideration or assumption by conduct of a duty to undertake an obligation to maintain or repair the leased premises; and
>
> (2) Failure to perform the agreement or assumed duty in a reasonable manner.

The Landlords therefore argue that they cannot be liable for Elder's injuries unless they agreed to maintain the property. The Landlords were lessors of the real estate for Dollar General pursuant to a written lease. Thus, we look to the lease provisions to determine the Landlord's duty. The lease provides in relevant part:

> 6. MAINTENANCE: Lessor represents and warrants that (1) the Demised Premises are well built, properly constructed, structurally safe and sound; (2) during the term of this Lease and any renewals hereof, it will so maintain them; and, (3) the Demised Premises conform to all applicable Requirements of the Americans with Disabilities Act of 1990, as amended, Pub. L. 101-336, 42 U.S.C. 12101 et seq. Lessor shall maintain at its cost and expense in good condition and shall perform all necessary maintenance, repair, and replacement to the exterior of the premises including, but not limited to, the roof, all paved areas, foundation, floors, walls, all

10

interior and exterior utility lines and pipes, and all other structural portions of the building during the term of this Lease and any renewal periods.

Although Elder presented no evidence of an ADA violation, that is not the issue in this case. The key question is whether the Landlords maintained the premises in "good condition" as the lease requires. The Landlords argue that Elder presented no evidence that the property was not maintained. Contrary to the Landlords' argument, Elder presented substantial evidence that the Landlords failed to maintain the exterior of the premises in good condition. Jennings testified that part of the concrete was smooth and likely to become slick when wet. According to Jennings, if a mat was not used in that area, a slip-resistant coating could have been applied to the concrete for minimal cost. Bryant had slipped there herself and had seen others slip there as well. Bryant reported the problem to Rodney Fagan, and he told her that it would be fixed. Viewing the evidence in the most favorable light to Elder, we conclude that substantial evidence supports the jury's verdict and affirm on this point.

We next turn to the causation testimony that Carson and Elder offered. Elder must show a causal nexus between her injuries and appellants' negligence. *Wheeler v. Bennett*, 312 Ark. 411, 849 S.W.2d 952 (1993). Elder presented her own and Carson's testimony to prove this nexus. Appellants argue that neither witness should have been allowed to present this type of testimony and that the circuit court erred by allowing it.

We first consider Carson's testimony. Appellants argue that the circuit court abused its discretion when it allowed Carson to testify that Elder's treatment needs were

11

caused by her fall. Appellants argue that this error was compounded because the circuit court did not grant their motion for a continuance to allow them to re-depose Carson after he provided supplemental discovery responses that they allege were inconsistent with his earlier deposition testimony.

Appellants first challenge to Carson's testimony is that the circuit court erred by not granting their motion for a continuance. They sought the continuance to re-depose Carson after Elder supplemented her discovery responses and stated that Carson planned to testify that Elder's fall caused the need for her future medical care. Appellants assert that Carson's supplemental opinion was effectively an "ambush."

The rule is settled that the grant or denial of a motion for continuance is within the sound discretion of the circuit court, and that court's decision will not be reversed absent an abuse of discretion amounting to a denial of justice. *City of Dover v. City of Russellville*, 346 Ark. 279, 57 S.W.3d 171 (2001). We have stated that an abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Hurt-Hoover Investments, LLC v. Fulmer*, 2014 Ark. 461, 448 S.W.3d 696. An appellant must show prejudice from the denial of a continuance, and when a motion is based on a lack of time to prepare, we will consider the totality of the circumstances; the burden of showing prejudice is on the appellant. *City of Dover*, 346 Ark. 279, 57 S.W.3d 171.

Elder provided her supplemental discovery responses on July 5, 2017. On July 13, appellants filed a motion in limine in which they sought to exclude Carson's proposed

12

causation testimony. They did not move for a continuance or argue that they needed additional time to take another deposition. The trial began on July 24, and the circuit court entered an order that day denying the motion in limine. At trial, appellants renewed their objection to Carson's offering causation testimony. After extensive voir dire, the circuit court determined that Carson was qualified to give causation testimony. Once the circuit court made that determination, appellants moved for a continuance. After hearing arguments from counsel, the circuit court declined to continue the case and noted that the case had been going on for four years and that a continuance at that point would have the effect of a mistrial. Considering the totality of the circumstances, we are not convinced that the circuit court acted improvidently, thoughtlessly, or without due consideration in denying a continuance. Therefore, the circuit court did not abuse its discretion in denying the continuance.

We turn next to appellants' argument that the circuit court erred by allowing Carson's causation testimony. According to appellants, Carson, as a chiropractor, was not qualified to give testimony that Elder's fall was the cause of her treatment. Rule 702 of the Arkansas Rules of Civil Procedure provides that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The test of qualification as an expert is whether, on the basis of the witness's qualifications, he or she has knowledge of the subject at hand which is beyond that of ordinary persons.

13

*Brumley v. Naples*, 320 Ark. 310, 896 S.W.2d 860 (1995).[2]  Whether an expert witness is qualified to testify at trial falls within the sound discretion of the circuit court.  *Fryar v. Touchstone Physical Therapy, Inc.*, 365 Ark. 295, 229 S.W.3d 7 (2006).  The circuit court's discretion is not absolute, however, in that a decision to exclude the testimony of an expert witness will be reversed where the circuit court has abused its discretion.  *Id.*  We have said that "the appellant bears the burdensome task of demonstrating that the trial court abused its discretion."  *Collins v. Hinton*, 327 Ark. 159, 164, 937 S.W.2d 164, 167 (1997).  Appellants do not challenge Carson's ability to testify to the necessity of his own treatment of Elder but contend that Carson's causation testimony regarding procedures that medical doctors performed conflicts with the holding of *Hardy v. Bates*, 291 Ark. 606, 727 S.W.2d 373 (1987).  We disagree.  In *Hardy*, a chiropractor was questioned as an expert medical witness.  However, when he was questioned about an injured person's disability, the court sustained an objection to the chiropractor's qualification to do so.  In affirming, this court said,

> The general rule concerning expert medical testimony by chiropractors, stated above, limits the testimony of a chiropractor to matters within the scope of the profession and the practice of chiropractic, hence a chiropractor can testify only about permanent disabilities which are within the scope of his field, the same as any other medical expert. Here, a foundation was not laid to show the scope of the chiropractor's field and, therefore, we are unable to say from the record before us that the trial judge abused his discretion.

*Id.* at 608, 727 S.W.2d 374.

---

[2]The General Assembly has defined a chiropractor as a "physician."  Ark. Code Ann. § 17-81-102(5) (Repl. 2018).

Appellants argue that *Hardy* demonstrates that a chiropractor may not testify as to the causal need for surgical procedures that a chiropractor may not perform. However, they read too much into *Hardy*. The problem in *Hardy* was that "a foundation was not laid to show the scope of the chiropractor's field[.]" *Hardy*, 291 Ark. at 608, 727 S.W.2d at 374. Therefore, the circuit court in that case did not abuse its discretion in prohibiting the chiropractor from offering testimony regarding an injured person's permanent disability. In contrast to the situation in *Hardy*, in this instance a proper foundation was laid to show the scope of Carson's field. The circuit court conducted extensive voir dire before it ruled that Carson could offer expert causation testimony. In voir dire, the circuit court heard that Carson's medical training consisted of 210 orthopedic hours and 320 hours of neurology. According to Carson, the training is very similar to that of a medical doctor. Carson testified that he had done human dissections and was trained to treat all joints of the body. He explained that he took pharmacology classes and that he understood how medication affected the body and how an injection could be preferable to an oral dose. He also exhibited a knowledge of Elder's surgical procedures. He attested that he had treated hundreds of patients with traumatic injuries over his career. Carson acknowledged that the treatment he offers differs from those of medical doctors and that he is not qualified to perform surgical procedures. He conceded that he would defer to treating physicians as to the need for their treatments. However, Carson did testify that he is qualified to make diagnoses of injuries and that he regularly refers his patients to other medical professionals if he believes different treatment is warranted. If a proper foundation is not laid, the

15

causation testimony of a chiropractor may be inadmissible. Here, however, in light of Carson's voir dire testimony regarding his education and experience, the circuit court did not abuse its discretion in finding that Carson could provide causation testimony. Indeed, Carson had treated Elder since 2004 and was uniquely qualified to testify as to the causal connection between her fall and her subsequent medical procedures because he was familiar with her condition both before and after her fall. Carson's specific training and his expertise were relevant to the weight a jury might give to his testimony, but the circuit court did not abuse its discretion when it allowed him to provide causation testimony.

Finally, appellants argue that the circuit court erred when it allowed Elder to testify to the necessity of her medical treatment. A circuit court has some discretion in determining whether a nonexpert witness, usually the injured party, has laid a sufficient foundation to testify about the reasonableness of treatment or the causal relationship. *Bell v. Stafford*, 284 Ark. 196, 680 S.W.2d 700 (1984). Arkansas Code Annotated section 16-46-107(a) provides that

> [u]pon the trial of any civil case involving injury, disease, or disability, the patient, a member of his family, or any other person responsible for the care of the patient shall be a competent witness to identify doctor bills, hospital bills, ambulance service bills, drug bills, and similar bills for expenses incurred in the treatment of the patient upon a showing by the witness that such bills were received from a licensed practicing physician, hospital, ambulance service, pharmacy, drug store, or supplier of therapeutic or orthopedic devices, and that such expenses were incurred in connection with the treatment of the injury, disease, or disability involved in the subject of litigation at trial.

Notably, appellants did not contest the reasonableness of Elder's treatment. They did argue that the treatments were not causally related to the injuries Elder sustained, and

16

they insist that allowing Elder's causation testimony was erroneous. Reasonableness of treatment and necessity of treatment are different issues. We discussed the difference in *Avery v. Ward*, 326 Ark. 829, 934 S.W.2d 516 (1996):

> Our decisions recognize a distinction between proof of reasonableness and proof of necessity. We have held that evidence of expense incurred in good faith is some evidence that the charges were reasonable. However, evidence of expense incurred alone is not sufficient to show that charges were causally necessary. Yet, the testimony of the injured party alone, in some cases, can provide a sufficient foundation for the introduction of medical expenses incurred. For example, if a litigant suffered a specific injury in an accident and was immediately taken to a hospital emergency room for treatment of only that specific injury, the injured party's testimony would be sufficient to establish the necessity of the medical expense as a result of the accident. However, expert testimony would normally be required to prove the necessity of the expense when. . . expenses for hospital tests were incurred many months after the accident, none of the physicians in attendance immediately after the accident referred the litigant either to the admitting doctor or to the hospital, and the expenses on their face do not appear to be related to the accident.

*Id.* at 833, 934 S.W.2d at 519 (quoting *Bell*, 284 Ark. at 199, 680 S.W.2d at 702–03).

Much of Elder's treatment, including her surgeries, occurred more than a year after her fall. Thus, Elder's testimony, standing alone, cannot establish that the necessity of the treatment was causally related to her fall, and the circuit court erred by allowing her testimony in this regard. However, Carson's testimony did provide a causal link, and Elder's testimony was therefore cumulative. Even when evidence is erroneously admitted, we will not reverse without a showing of prejudice. *Bedell v. Williams*, 2012 Ark. 75, 386 S.W.3d 493. Because Carson's testimony, standing alone, was sufficient to establish the causal necessity of Elder's treatment, there was no prejudice in the admission of Elder's causation testimony, and we affirm.

17

Affirmed; court of appeals' opinion vacated.

HART, WOOD, and WOMACK, JJ., dissent.

**JOSEPHINE LINKER HART, Justice, dissenting.** I dissent. First, there was no risk or potential harm in this case that should not have been known or obvious to the plaintiff at the time of her fall. An outdoor sidewalk, wet from falling rain, is not an unreasonably dangerous condition. Second, the testimony from the plaintiff's chiropractor regarding the cause of treatment by other medical doctors simply went too far. The chiropractor was the only expert who supplied testimony regarding causation, but that testimony covered surgeries and procedures that he had no involvement with and that were outside his area of expertise. Furthermore, the defendants should have received a continuance when the plaintiff disclosed that the chiropractor would be supplying this testimony. Under oath at his deposition, the chiropractor specifically denied that he would testify as to the cause of any medical treatment provided to the plaintiff by other physicians. Then, two weeks before trial, the chiropractor did an about-face to the effect that he would be opining as to the cause of all those other medical treatments. Allowing this was erroneous and amounts to trial by ambush. I would reverse for any of these reasons.

I. *Unreasonably Dangerous Condition*

An Arkansas property owner has a duty to exercise ordinary care to maintain a premises in a reasonably safe condition for the benefit of invitees. *Dye v. Wal-Mart Stores Inc.*, 300 Ark. 197, 198, 777 S.W.2d 861, 862 (1989) (directed verdict in slip and fall case affirmed on appeal). An invitee is one who visits "for a purpose connected with the

18

business dealings of the owner." *Young v. Paxton*, 316 Ark. 655, 660, 873 S.W.2d 546, 549 (1994). An Arkansas landowner generally does not owe a duty to an invitee if a danger is known or obvious. *Kuykendall v. Newgent*, 255 Ark. 945, 947, 504 S.W.2d 344, 345 (1974) (citing William L. Prosser, *Handbook on the Law of Torts*, § 61 (4th ed. 1971); 2 Fowler v. Harper and Fleming James, *The Law of Torts* § 27.13 (1956); Restatement (Second) of Torts § 343A (1965)); accord *Dye*, 300 Ark. at 198, 777 S.W.2d at 862.

An owner's duty to warn an invitee of a dangerous condition applies only to defects or conditions that are hidden dangers, such as traps, snares, pitfalls and the like—hazards which are known to the owner-invitor but not known to the invitee and would not be observed by the latter in the exercise of ordinary care. *Ethyl Corp. v. Johnson*, 345 Ark. 476, 481, 49 S.W.3d 644, 648 (2001); *Jenkins v. Hestand's Grocery*, 320 Ark. 485, 487, 898 S.W.2d 30, 31 (1995) (no duty or liability for owner because hazard not known or hidden); *Kroger Co. v. Smith*, 93 Ark. App. 270, 275, 218 S.W.3d 359, 363 (2005); *Kuykendall*, 255 Ark. at 947, 504 S.W.2d at 345. A slip-and-fall by an invitee on an owner's premises does not in itself give rise to an inference of negligence as a matter of law. *Black v. Wal-Mart Stores*, 316 Ark. 418, 419, 872 S.W.2d 56, 57 (1994) (collecting cases); accord *Dye*, 300 Ark. at 198, 777 S.W.2d at 862. "[I]n virtually every case involving a fall, the plaintiff will describe a floor as slick or slippery, and this alone is not sufficient to support a case for negligence." *Id.* at 421, 872 S.W.2d at 58.

To sum up, in a slip-and-fall case, the plaintiff bears the burden of proving that there was a dangerous condition, known to the owner of the premises, and hidden from or

19

not obvious to the plaintiff. Importantly, the premises owner's duty does not extend to dangers that should have been obvious or known to the plaintiff.

In this case, testimony regarding the circumstances of the plaintiff's fall came from the plaintiff herself, a store employee, and the plaintiff's expert witness. The plaintiff was running through the rain toward the defendants' store in her "flip-flops or tennis shoes" when she, according to her testimony, slipped and fell on the concrete sidewalk outside the door.

The store employee testified that she had seen four other people "slip" on the concrete outside the door in the six years she worked there, though it is not clear from the employee's testimony if those others actually fell to the ground. Likewise, this testimony lacked any specificity as to the circumstances of those other "slips," such as whether the person was walking or running, whether the person was wearing high heels or loose-shoe strings, whether it was raining, etc. There was no specific evidence relating the cause of those slips or their relationship to the sidewalk. This is important because the mere fact that someone slips and falls does not give rise to even an inference of negligence on the part of the defendant. *Black*, *supra*. The store employee also testified that the right side of the concrete outside the store's door (which is where she saw Karen fall, according to her testimony) appeared smoother and slicker than the concrete on the left side of the door. But this supports the open and obvious nature of the claimed defect.

Finally, the plaintiff's expert witness, who performed slip-resistance testing on the concrete outside the store's door, testified as follows:

> The results of my testing showed that there were, areas of at or below low tread -- the *low* tread reactions. Some *moderate* slip resistance, or tread reactions, and it also showed that there was some areas that had *high* reactions as well ... It is correct that *none of the areas tested had low traction*. I do not know the exact place Ms. Elder fell. I don't know how much water was on the concrete when she fell.

(Emphases added.)

Overall, even giving the evidence its full weight in favor of the plaintiff, it does not establish the existence of an unreasonably dangerous condition. If there was a risk of harm here, then the risk should have been known or obvious to the plaintiff. In the plaintiff's situation, what would she know through reasonable exercise of ordinary care? She ought to know that rain makes things wet. She ought to know that wetness could make surfaces, such as walkways, slicker. And she ought to know that a given spot on a walkway surface (whether it be a street, a parking lot, or a sidewalk) might be slicker or rougher than a different spot on that same surface. One can only wonder how many miles of different outdoor walkways there are in this country, and those walkways do not become "unreasonably dangerous conditions" simply because it starts to rain.

With all due respect to Elder, the risk of harm at the time of her fall should have been known or obvious to her. That the defendants may have been told of others who slipped in the same place (under conditions we know nothing about) would not change this conclusion. Under the law, that means Elder cannot recover damages from the defendants. Not every case features an injury that is compensable, and in my view, this is such a case.

21

## II. *Chiropractor's Testimony*

I also dissent from the majority's conclusion that the circuit court did not err in admitting the medical-causation opinions of Dr. Carson. "Not every doctor can qualify as an expert in every given case." *Travelers Ins. Co. v. Wilson*, 28 S.W.3d 42, 48 (Tex. Ct. App. 2000). Allowing Dr. Carson to testify that the fall Elder experienced at Dollar General necessitated the surgeries to her neck, back, and shoulder, which took place months and years later, was in error. Dr. Carson had no role in these procedures, and they were outside his area of expertise. If the plaintiff wanted to establish causation between her fall and these procedures, then the plaintiff should have called as witnesses the specialists who performed those procedures.

It was speculative at best for Dr. Carson to testify that it was the plaintiff's fall at Dollar General which caused her to need the surgeries performed by these other specialists. Causation between the plaintiff's fall and her subsequent surgeries was a disputed element of the plaintiff's case. The plaintiff's chiropractic records establish that she had been experiencing the same pains she attributed to the fall at trial for years predating the fall at Dollar General. In fact, one May 5, 2009 report alone establishes that the plaintiff was experiencing pain in her neck, middle back, low back, and shoulder that day. Note that the plaintiff testified that she experienced no shoulder pain until after the fall at Dollar General on June 10, 2010. The May 5, 2009 report provided that she had been experiencing these symptoms for "years" and that she rated her pain that day as an "8" out of 10. Other observations contained in Dr. Carson's records from that same date

22

(connecting the plaintiff's symptoms to a "sprain" and a "strain") suggest trauma that predates the fall. In other words, Dr. Carson's own medical records undercut his testimony that the fall at Dollar General is what necessitated the plaintiff's subsequent surgeries performed by other specialists.

As the majority writes, Dr. Carson received training in orthopedics and neurology as part of his chiropractic curriculum. However, Dr. Carson's training did not include any sort of surgical residency, and he has never performed any surgeries. Indeed, neurosurgeons' and orthopedic surgeons' training and experience are not synonymous. As Dr. Carson testified during voir dire, chiropractors provide different treatment than medical doctors. Chiropractors' treatment focuses on physical medicine, like spinal manipulation, muscle stimulation, and disc decompression; whereas neurosurgeons' and orthopedic surgeons' treatment may include prescription medications and surgery.

Thus, given his training and experience, Dr. Carson could make certain neurologic and orthopedic diagnoses. But it was reversible error for the circuit court to allow him to relate his diagnoses to the reasonableness of the surgeries rendered and prescriptions given by her medical doctors, or to causally relate those surgeries to her fall. *See Structural Pres. Sys., Inc. v. Petty*, 927 A.2d 1069 (D.C. 2007) (treating chiropractor unable to testify as to necessity of physical therapy because she could not prescribe physical therapy on her own authority); *Sebroski v. United States*, 111 F. Supp. 2d 681 (D. Md. 1999) (chiropractor not qualified to testify as to the necessity of an MRI because such test is beyond his expertise and training); *Brodersen v. Sioux Valley Mem. Hosp.*, 902 F. Supp. 931 (N.D. Iowa 1995)

23

(physicians unable to testify as to standard of care of a chiropractor). Other jurisdictions have recognized this and emphasized the importance of limiting chiropractor testimony to their area of expertise. "The district court sufficiently limited Dr. Reilly (chiropractor) to his treatment of Kudabeck and the conclusions he drew from his treatment and expertise." *Kudabeck v. Kroger*, 338 F.3d 856 (8th Cir. 2003) (explaining the district court did not allow the chiropractor to testify that he based his conclusions on the reports of other physicians and that it prevented him from testifying as to his opinion of the patient's MRI) *See also Moreno v. Ingram*, 454 S.W.3d 186 (Tex. Ct. App. 2014) (holding that chiropractor was not qualified to testify as to non-chiropractic medical expenses nor could he give testimony concerning matters because he was not "qualified by training, education, or statute to perform the procedures himself and that he did not make the decisions whether to undertake the treatment").

This error was compounded by the fact that the defendants were denied a continuance after the plaintiff's late (two weeks before trial) disclosure that Dr. Carson would be testifying about causation, when he had specifically averred during his deposition that he would offer no such testimony at trial. Causation was a necessary (and disputed) element of the plaintiff's case, and the plaintiff offered no other expert testimony as to a causal connection between the plaintiff's fall and these subsequent procedures. The defendants should have been afforded the opportunity to re-depose Dr. Carson, and the denial of this opportunity was prejudicial.

I dissent.

WOOD and WOMACK, JJ., join this opinion.

*Dover Dixon Horne PLLC*, by:  *Todd Wooten* and *Carl "Trey" Cooper*, for appellants.

*The Applegate Firm, PLLC*, by:  *Kayla M. Applegate* and *Ryan J. Applegate*, for appellee.